## UNITED STATES BANKRUPTCY COURT
## WESTERN DISTRICT OF VIRGINIA
## LYNCHBURG DIVISION

In re:   MICHAEL LEE FULCHER and )   Case No. 04-01442-WA3-7
   ANNE WESLEY FULCHER, )
            )
     Debtors,     )
            )

## ORDER

For the reasons stated in the accompanying memorandum, the motion of the United States trustee to dismiss this case for substantial abuse is denied.

So ORDERED.

Upon entry of this Order the Clerk shall forward copies to the United States trustee, the chapter 7 trustee, the debtors and Angela M. Barlow, Esq., counsel for the debtors.

Entered on this **9th** day of March, 2005.

              _William E. Anderson_
              William E. Anderson
              United States Bankruptcy Judge

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF VIRGINIA**
**LYNCHBURG DIVISION**

In re:  MICHAEL LEE FULCHER and     )      Case No. 04-01442-WA3-7
       ANNE WESLEY FULCHER,        )
                                    )
          Debtors,                 )
   _____ )

## MEMORANDUM

This matter comes before the court on a motion by the United States trustee to dismiss

this case for substantial abuse.  The motion is brought under section 707(b) of the bankruptcy

code.[1]  The motion will be denied.

### *I. Facts*

During 2002, the debtors gross income from wages was $109,896.00.  In 2003, they

earned $110,092 from wages and unemployment compensation.

---

[1]       Herein, "section" refers to the given section in the bankruptcy code.  The bankruptcy code is
codified at 11 U.S.C. § 101 et seq.

In August of 2002, the debtors purchased a 2003 Harley Davidson motorcycle. They traded in two motorcycles and incurred some new secured debt. Eventually they paid off that debt with the proceeds of a January, 2003, loan secured by a second deed of trust on their residence. In October of 2002, the debtors purchased a horse trailer for approximately $15,000.00. In early 2003, they purchased a utility trailer.

On June 19, 2003, the debtors purchased a 2003 Chevrolet Silverado [Movant's Exhibit #6]. They traded in a 1997 GMC 3500 truck which they assert was beginning to incur substantial repairs. They incurred additional secured debt in the approximated amount of $29,500.00 because of the purchase.

During 2002, Mrs. Fulcher earned $35,445.00 from employment with Merchant's Tire, a job that she had held for 16 years. During that time she was able to work at home. In June of 2003, Merchant's Tire reduced its operations and she lost her job. Three or four months after she lost her job with Merchant's Tire, she found employment with Lantern Lane Farm, Inc. ("Lantern Lane"). She could no longer work at home. During 2003, she earned $25,987.06 from Merchant's Tire, including separation pay. She also earned $5,088.00 in unemployment compensation and $3,569.85 from Lantern Lane. Her total income in 2003 was $34,644.91.

On April 12, 2004, the debtors filed a chapter 7 petition. On their Schedule I, they disclosed that Mr. Fulcher has been employed as a service technician for four years and that he earns approximately $5,633.00 per month. They further disclose that Mrs. Fulcher has been employed as a bookkeeper and earns approximately $1,557.00 per month per month. She also disclosed $400.00 per month in additional income from Lantern Lane, evidently for work other than bookkeeping. When the debtors filed their petition, Mrs. Fulcher was paid by way of two

2

separate checks. After they filed their petition, Lantern Lane began paying her with one check. The debtors scheduled a total of $5,728.92 in net monthly income. The debtors have two children, ages 8 and 13.

The debtors scheduled $5,933.00 in monthly expenses. They scheduled $294,786.00 in secured debt and $43,708.31 in general unsecured debt. The secured debt includes two deeds of trust in the total amount of approximately $219,444.98. The deeds of trust are secured by the debtor's residence, which is valued on Schedule A at $210,000.00. On July 22, 2004, the United States trustee filed a motion under 11 U.S.C. § 707(b) to dismiss this case on the grounds that granting relief would constitute substantial abuse.

## II. Discussion

This court has jurisdiction over this matter by virtue of the reference from the United States District Court. 28 U.S.C. §§ 1334(a). This is a core proceeding. 28 U.S.C. § 157(b)(2)(A). Accordingly, this court may render a final order.

A case under chapter 7 may be dismissed if (1) the debtors' debts are primarily consumer debts and (2) it would be a substantial abuse of the provisions of chapter 7 of the bankruptcy code to grant relief. 11 U.S.C. § 707(b)[2].

"There shall be a presumption favor of granting the relief requested by the debtor." 11

---

[2] Section 707(b) provides:

(b) After notice and a hearing, the court, on its own motion or on a motion by the United States trustee, but not at the request or suggestion of any party in interest, may dismiss a case filed by an individual debtor under this chapter whose debts are primarily consumer debts if it finds that the granting of relief would be a substantial abuse of the provisions of this chapter. There shall be a presumption in favor of granting the relief requested by the debtor. In making a determination whether to dismiss a case under this section, the court may not take into consideration whether a debtor has made, or continues to make, charitable contributions (that meet the definition of "charitable contribution" under section 548(d)(3)) to any qualified religious or charitable entity or organization (as that term is defined in section 548(d)(4)).

U.S.C. § 707(b). The burden of proof and the burden of production in a motion to dismiss for substantial abuse clearly rests with the moving party, in this case the United States trustee. See 4 Collier on Bankruptcy, "Dismissal", ¶ 707.04[5][a], p. 707-27 (15th ed. rev.) (Citing Green v. Staples (In re Green), 934 F.2d 568 (4th Cir. 1991)). But, the presumption is meant to be something more that a rule about the burden of proof since that burden would already have been on the party seeking to dismiss the case. Collier, supra. "Therefore, it appears that the presumption is an indication that in deciding the issue, *the court should give the benefit of any doubt to the debtor* and dismiss a case only when a substantial abuse is clearly present." 4 Collier on Bankruptcy at 707-28. (Emphasis added.)

The first issue is whether the debtors' debts are consumer debts. Consumer debts are those "incurred by an individual primarily for a personal, family, or household purpose". 11 U.S.C. § 101(8). The debtors do not deny that their debts are primarily consumer debts in this case.

### A. Disposable Income.

1. The Discussion of Disposable Income in Green.

We turn now to the issue of substantial abuse. In Green, the Fourth Circuit provided trial courts with guidance to determine whether granting relief to a debtor would constitute substantial abuse. In Green, the debtor's income exceeded his necessary expenses by $638.00 per month. He was employed as a bus driver, a job that he had held for at least 13 years. He had earned $46,000.00 during 1988, but asserted that he had been out of work for six months and estimated that he would only earn $26,000.00 in 1989. The Bankruptcy Court granted the motion to dismiss the debtor's case solely on the grounds that he had disposable income. The United States

4

District Court affirmed the decision of the Bankruptcy Court.

On appeal, Fourth Circuit Court of Appeals held that the fact that the debtor had disposable income beyond his expenses was not sufficient in and of itself to warrant dismissal of the debtor's case.

The Fourth Circuit Court of Appeals held that a debtor's ability to pay his or her debts when due, as determined by his ability to fund a Chapter 13 plan, does not, by itself, constitute substantial abuse. Green, 934 F.2d at 571-572. Rather, the Court concluded that "the determination must be made on a case-by-case basis, in light of the totality of the circumstances." Green, 934 F.2d at 572. The Court remanded the case to the Bankruptcy Court with instructions to consider the totality of the circumstances. The Court also provided guidance concerning some of the circumstances that trial courts were to consider.

Because the Bankruptcy Court had based its decision solely on the fact that the debtor had disposable income, the Fourth Circuit Court of Appeals first addressed the degree to which a trial court should consider disposable income in rendering a decision on a motion under section 707(b).[3] First, the existence of disposable income does not, without more, constitute substantial abuse. The Court considered such a per se rule, first looking at the Congressional history.

> The ambiguity of the statutory language is no doubt a reflection of Congress's inability to agree on a definition of substantial abuse which would encompass these countervailing considerations in all situations. Nevertheless, in unsuccessfully attempting to carve out such a definition, Congress considered and rejected the use of a threshold future income or ability to repay test (known as "mandatory Chapter 13") as a qualification for Chapter 7 relief for consumer debtors. [Footnote omitted.] *In re Deaton,* 65 B.R. 663, 665

---

[3]       Disposable income is defined, for purposes of section 1325, which requires the debtor to pay all of his or her disposable income into the plan, as "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor. . ." 11 U.S.C. § 1325(b)(2).

(Bankr.S.D.Ohio 1968).

Green, 934 F.2d at 571.

The Court also rejected a *per se* rule in light of a fundamental precept of bankruptcy law.

"The establishment of a future income threshold of eligibility for Chapter 7 by means of the *per

se* rule we are urged to adopt would render this presumption [in favor of granting the relief

requested by the debtor] toothless." Green at 573.

Finally, the Fourth Circuit considered the Bankruptcy Code and Rules as a whole and

section 109[4] of the Bankruptcy Code in particular.

> Moreover, nowhere in the Code is there a requirement that a debtor be insolvent
> in order to file for bankruptcy. Section 109, which the 1984 Amendments left unchanged,
> allows any person to be a debtor under Chapter 7 unless he comes within one of several
> limited exceptions, none of which apply to consumer debtors and none of which are
> predicated upon anticipated income. 11 U.S.C.A. § 109 (1979 & West Supp.1990).
> Section 109, taken together with the Senate report on Section 707(a) cited *infra*, provides
> a strong indication that Section 707(b) was intended to explicitly recognize the court's
> ability to dismiss a Chapter 7 petition for lack of good faith-- when "the total picture is
> abusive." *Waites v. Braley, supra,* 110 B.R. at 215 (quoting bankruptcy court Opinion
> and Order; *but see* 217, holding that neither bad faith nor fraud is an element required for

---

[4] Section 109(b), which concerns whether a person is eligible to be a chapter 7 debtor, provides:

(b) A person may be a debtor under chapter 7 of this title only if such person is not--
    (1) a railroad;
    (2) a domestic insurance company, bank, savings bank, cooperative bank, savings and loan
    association, building and loan association, homestead association, a New Markets Venture Capital
    company as defined in section 351 of the Small Business Investment Act of 1958, a small business
    investment company licensed by the Small Business Administration under subsection (c) or (d) of
    section 301 of the Small Business Investment Act of 1958, credit union, or industrial bank or
    similar institution which is an insured bank as defined in section 3(h) of the Federal Deposit
    Insurance Act, except that an uninsured State member bank, or a corporation organized under
    section 25A of the Federal Reserve Act, which operates, or operates as, a multilateral clearing
    organization pursuant to section 409 of the Federal Deposit Insurance Corporation Improvement
    Act of 1991 may be a debtor if a petition is filed at the direction of the Board of Governors of the
    Federal Reserve System; or
    (3) a foreign insurance company, bank, savings bank, cooperative bank, savings and loan
    association, building and loan association, homestead association, or credit union, engaged in such
    business in the United States.

a finding of substantial abuse).

Id.

The United States trustee in the case at bar characterizes the Court's opinion in Green as endorsing the use of a test that would place a heightened emphasis on the debtor's ability to fund a chapter 13 plan. This court does not believe that Green stands for the proposition. How relevant, then, is the existence of disposable income in a putative chapter 13 case in the Fourth Circuit in the determination of whether the debtor's chapter 7 filing constitutes substantial abuse?

The United States trustee urges this court to adopt a rule that would provide that disposable income is the primary or principle factor in determining whether substantial abuse exists. He argues that Green is "not irreconcilable" with subsequent opinions that have held that disposable income is a primary factor. This court disagrees. The United States trustee cites no such language in Green. The Court in Green notes that in many circuits the presence of disposable income constitutes a (or the) primary factor to be considered in determining whether granting the debtor relief would constitute substantial abuse. And, while the Court did not reject this proposition, neither did it endorse it. Rather, the Court held that a finding of substantial abuse is to be based on the totality of the circumstances.

Whether a debtor's disposable income is to be given more or less consideration than other factors is to be determined on a case-by-case basis. For instance, if a debtor were to borrow $50,000.00 in unsecured debt, spend it on an extravagant vacation, and then file a chapter 7 petition, that alone would surely amount to substantial abuse. In such a case, a trial court would surely dismiss the case even if the debtor had no disposable income. If disposable income standing alone is not sufficient for a finding of substantial abuse, and other facts can be, then it

7

would seem that disposable income might, in some cases, carry less weight than the other factors enumerated by the court.

    2. The Debtors' Disposable Income.

The amount of a debtor's disposable income is important in the context of a motion under section 707(b) because it is one[5] of three minimum amounts a debtor must pay through a chapter 13 plan if that plan is to be confirmed. In other words, it is a measure of the amount that the debtor could pay toward his or her unsecured debt if he or she chose to file a case under chapter 13. Disposable income may be defined as the difference between a debtor's net income and his expenses.[6]

*The debtors' scheduled income and expenses.* Mr. Fulcher scheduled gross monthly income of $5,633.00. Mrs. Fulcher scheduled monthly income of $1,957.00. The debtors together scheduled $7,590.00 in gross total income. They scheduled net monthly income of $5,728.92 and monthly expense of $5,933.00. Their schedules, then, indicated that they had a net monthly disposable income of negative $204.08.

*Mr. Fulcher's gross income.* The United States trustee asserts that Mr. Fulcher's monthly income for purposes of calculating the debtors' disposable income should be $6,161.00 and not $5,633.00, as scheduled by the debtors on their Schedule I. This assertion is based on Mr. Fulcher's payroll statement for the period ending July 27, 2004. That statement indicates that he

---

[5]    A debtor must commit all of his or her disposable income to play payments if the plan is to be confirmed. See 11 U.S.C. § 1325(b)(1)(B). Additionally, the debtor must pay all priority claims as defined in section 507(a) in full, see 11 U.S.C. § 1322(a)(2), and must pay unsecured claims in an amount equal in an amount to what those creditors would receive if the case were a case under chapter 7 (commonly referred to as the best-interest-of-the-creditors test) see 1325(a)(4).

[6]    See footnote 3, <u>supra</u>, for the definition "disposable income" in the bankruptcy code.

earned a total of $43,127.06 ($6,161.00 per month) from the beginning of the year until that date.

Mr. Fulcher's gross monthly income of $5,633.00 listed on Schedule I is based on his annual base income of $67,600.00, which is calculated based on an hourly wage of $32.50 at 40 hours per week for 52 weeks. He states that during the winter months the overtime ceases and that further there are months during which he receives less than 40 hours of work per week.

On the one hand, this makes sense. Mr. Fulcher repairs tower cranes used for pouring cement. During the winter months, those in the construction industry, and those that supply services to that industry, work less than they do during the summer months. Mr. Fulcher's last payroll statement before the date of petition, that ending March 27, 2004, indicates that he earned $15,578.17, or $5,192.00 per month, through that date. This amount is less than the amount on the Debtor's schedule I. It was reasonable for the debtors to expect that Mr. Fulcher would earn less than $5,633.00 per month during the winter months, thus offsetting the overtime income earned during the construction season. Indeed, if he and his wife had filed a chapter 13 petition and plan that was based on 10 overtime hours per week, the chapter 13 trustee might have objected to the plan on the grounds that it was not feasible.

On the other hand, the debtors' Statement of Financial Affairs[7] indicates that Mr. Fulcher earned income during 2002 and 2003 that indicates that he did earn overtime. [Movant's Exhibits #3 & #4]. The issue then becomes, for purposes of calculating the debtors' disposable income, whether Mr. Fulcher would be required to work overtime if the debtors had chosen to file a case under chapter 13.

Courts are not unanimous on this issue. One court has considered the issue at length.

---

[7]    See Item I of the debtors' Statement of Financial Affairs. [Movant's Exhibit #1]

9

Courts are divided when considering whether earnings received from working overtime hours, or from working a second part time job, should be factored into determining a debtor's prospective ability to pay.   Some believe that a debtor's decision to reduce overtime hours or to quit a second job, even for health or family reasons, is a circumstance that suggest bad faith and weighs in favor of dismissal. [Footnote 49[8]]. The opposing view is that a debtor's decision to reduce overtime hours or to quit a second job is a personal decision, reasonably made, for any reason, but especially if made for the benefit of the debtor's health or the welfare of a family.

Attanasio, 218 B.R. at 214 -215.   The Court in Attanasio concluded that a debtor's failure to

work overtime should not be constitute substantial abuse under section 707(b).

Wage and hour laws contemplate that a person works 40 hours per week.   Section 707(b) neither provides nor even suggests that a debtor must work beyond that amount for the benefit of creditors. [Footnote 50[9]]   And this Court believes, as do others, that "it

---

[8]        Footnote 49 in Attanasio provides:

For instance in In re Helmick, 117 B.R. 187 (Bankr.W.D.Pa.1990), one of the joint debtors, who worked in a mine, decided, for health reasons, to work a job outside the mine, rather than the job he had historically held.   The end result was that the debtor would have less opportunity to work overtime hours outside the mine than he would have had inside the mine.   The bankruptcy court held that substantial abuse was indicated, stating:
>   Additionally, no evidence was presented as to why working outside would drastically reduce [the debtor's] overtime hours.   It appears that if there is activity within the mine, then there would be a call for activity outside as well.   At the least, Debtor had a duty to clarify this matter, since some explanation was in order.
17 B.R. at 190.
See also In re Carlton, 211 B.R. 468 (Bankr.W.D.N.Y.1997) (substantial abuse indicated where debtor contended that "at 45 years old he can no longer work the overtime that he previously did to maintain a higher level of income" thereby raising a concern as to his "honesty and good faith"); In re Stallman, 198 B.R. 491 (Bankr.W.D.Mich.1996) (substantial abuse indicated where the debtor had earned $6,264 in extra income as an independent consultant in the year preceding bankruptcy but contended after bankruptcy that he could not continue to do so because his current schedule did not allow for the necessary travel); In re Dubberke, 119 B.R. 677 (Bankr.S.D.Iowa 1990) (substantial abuse indicated where the debtor, a single mother, quit her second part-time job in order to stay home with her son); In re Ploegert, 93 B.R. 641 (Bankr.N.D.Ind.1988) (substantial abuse indicated where debtor misled the court by failing to include historical overtime pay of 20 to 30 hours per month in the income listed on his statement of income and expenses since historical overtime should be included in disposable income calculation).

[9]        Footnote 50 in Attanasio provides:

See In re Laury-Norvell, 157 B.R. 14 (Bankr.N.D.Ohio 1993) (substantial abuse not indicated where the debtor's pre-bankruptcy earnings history was inflated because in the year preceding bankruptcy the debtor worked an inordinate amount of overtime and double shifts to the detriment of her health and was incapable of working such a substantial amount of hours anymore); In re Hampton, 147 B.R. 130 (Bankr.E.D.Ky.1992) (substantial abuse not indicated where the debtor, a single mother, quit her second

should not use any standard of previous earnings which is based upon extraordinary work efforts by a debtor when evaluating the ability of the debtors to fund a Chapter 13 plan when the Court is determining whether there is substantial abuse pursuant to § 707(b)." *In re Hampton,* 147 B.R. 130, 131 (Bankr.E.D.Ky.1992).

*Attanasio,* 218 B.R. at 215.   Also see Commercial Credit Corporation v. Killough (In re Killough), 900 F.2d 61, 65-66 (5th Cir. 1990) (affirming the bankruptcy court's holding that overtime income is not to be considered in the calculation of disposable income in chapter 13.)

This court agrees with the court in Attanasio, especially in light of the admonition that this court should give the benefit of any doubt to the debtor and dismiss a case only when a substantial abuse is clearly present.[10]  For purposes of this 707(b) motion, Mr. Fulcher's gross monthly income is found to be $5,633.00 per month.   His net monthly income is found to be $4,035.81. [See debtors' Schedule I, Movant's Exhibit #2].

*Mrs. Fulcher's Gross Income.*  Mrs. Fulcher scheduled gross income of $1,957.00 and net income of $1,693.11.   The evidence clearly supports these amounts.   The United States trustee has calculated that Mrs. Fulcher earned gross income of $1,994.91 and net income of $1,624.52 during the first 31 weeks of 2004. [Movant's Exhibit #9].   The court finds that Mrs. Fulcher's scheduled gross income of $1,957.00 and her scheduled net income of $1,693.11 are correct.[11]

---

part-time job in order to stay home with her son).

[10]       This is not to say that a debtor's overtime should never be considered in determining disposable income in chapter 13.   For instance, if a debtor's job requires overtime as a matter of course, then it would be proper to include it in the calculation of disposable income.   In other cases, the debtors may be required to include overtime income in their calculation of disposable income in order to meet the best-interest-of-the-creditors test or to pay their priority claims in full.   See footnote 5, *supra.*

[11]       The United States trustee makes inconsistent arguments regarding Mrs. Fulcher's income.   In his original brief he asserts that the debtors' gross monthly income was understated by $965.00.   This amount necessarily ignore the additional $400.00 that Mrs. Fulcher listed separately on Schedule I as originally filed. [Movant's Exhibit #2.] She scheduled it separately because she received two different checks from her Lantern Lane each pay period.
In his Exhibit #9 and #10, the United States trustee includes the $400.00 in the analysis, arguing that the

*The Debtor's Total Gross and Net Income.*    Under chapter 13, the debtors' total gross income would be $7,590.33 and their net income would be $5,728.92.

*Expenses.*    We now turn to those expenses in the debtors' Schedule I that a chapter 13 trustee might challenge.  It should be noted that while the analysis of the debtors' expenses is generally the same in a "substantial abuse" motion as it is during the chapter 13 confirmation process, the purpose, and hence the scrutiny, is different.

> There, the standard is the necessary support and maintenance of the debtors and their dependents.  Some of these expenses may be more finely tuned in a chapter 13 case.  11 U.S.C. § 1325(b)(2).  Here, the standard is different.  It is one of substantial abuse.  11 U.S.C. § 707(b).  The difference is further discussed below.

In re Vansickel, 309 B.R. 189, 199, n. 19 (Bankr. E.D.Va. 2004).  Below, the Court stated:

> The purposes of § 707(b) and § 1325(b)(1)(b) are different.  Section 1325 is designed to assure that a chapter 13 debtor makes his best efforts in a chapter 13 plan.  Section 707(b) is a gatekeeping provision designed to assure that chapter 7 is not abused.  The abuse sought to be prevented is "a debtor seeking to take unfair advantage of his creditors." *Green,* 934 F.2d at 572.

Vansickel, 309 B.R. at 208.

The United States trustee argues that the debtors would not be able to include two expenses if they were seeking to have a chapter 13 plan confirmed.    The United States trustee objects to the debtors' payment of $350.00 per month for a horse trailer and $807.69 per month for the Chevrolet Silverado.

---

debtors understated their gross income by $565.00 and their net income by $365.74, amounts that arise by virtue of the assertion that Mr. Fulcher should have included overtime in his Schedule I.

In his Reply brief, the United States trustee again asserts that the debtors understated their income by $965.00.  He then admits that Mrs. Fulcher scheduled the additional $400.00 in income, but asserts, incorrectly, that it was from a second job and that she no longer has the source of income.  He then concludes, incorrectly, that the net effect of the lost income is that the debtors understated their income by $965.00.  In fact, if Mrs. Fulcher had scheduled $400.00 in income that she did not have, then the debtors' gross and net income would be overstated, not understated.

12

The horse trailer is only necessary because the debtors own two horses. In chapter 13, while some expense would be allowed for the maintenance of pets, the $350.00 is more than would be allowed. <u>See</u> <u>In re Wyatt</u>, 217 B.R. 585 (Bankr.D.Neb.1998). (Debtor's expenditure of $175.00 per month for the care of several horses and dogs, which were elderly and required extraordinary veterinary expenses, deemed excessive unreasonable, and not necessary for the maintenance or support of the debtor or his dependents.) <u>Cf.</u> <u>In re Cohen</u>, 246 B.R. 658 (Bankr. D.Colo.2000) (Allowing $100.00 per month for feeding and care of two dogs). For purposes of this discussion, the $350.00 expense for the horse trailer will not be allowed. The court would allow an expense of $100.00 in chapter 13 for maintenance of pets. This court will allow that amount in this analysis, especially in light of the fact that the debtors did not schedule any other expense for the horses.[12]

Not all of the $807.69 payment for the Chevrolet Silverado will be allowed as some part of that amount is based on the need to own a vehicle that pull the horse trailer . The amount is excessive for basic transportation. $500.00 will be allowed for purposes of this discussion. This represents a $307.69 reduction in vehicle payment expense. Thus the debtors expenses will be cut by an amount of $557.69 (=  $307.69 + $250.00). The debtors expenses are $5,375.31 (= $5,933.00 - $557.69).

*Disposable Income.* The debtors disposable income for purposes of this discussion is $353.61 ( = $5,728.92 - $5,375.31). The debtors could pay $12,729.96 during the pendency of a 36-month plan, an amount that would permit the debtors to pay approximately 29% of their unsecured debt.

---

[12]      See debtors' Schedule J. [Movant's Exhibit #2]

**B. Other Considerations**

As noted above, in <u>Green</u> the Fourth Circuit Court of Appeals listed a number of other factors for consideration by the trial courts when considering a motion under section 707(b), the court provided a non-exclusive list of five factors for courts to consider.  They are.

(1)    Whether the bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment;

(2)    Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;

(3)    Whether the debtor's proposed family budget is excessive or unreasonable;

(4)    Whether the debtor's schedules and statement of current income and expenses reasonably and accurately reflect the true financial condition;

(5)    Whether the petition was filed in good faith;

<u>Green</u>, 934 F.2d at 572.

At the end of the <u>Green</u> opinion, the Fourth Circuit Court of Appeals cited three opinions that trial courts might find helpful in considering motions under section 707(b), thus providing three more factors.

(6)    Whether the debtor engaged in free-wheeling spending[13];

(7)    Whether the debtor altered monthly obligations in statements to the court at least three times[14]; and

(8)    Whether the debtor chose Chapter 7 over Chapter 13 in order to voluntarily pay

---

[13]    See <u>In re Grant</u>, 51 B.R. 385, 396 (Bankr. N.D.Ohio 1985) (Cited in Green, 934 F.2d at 573.)

[14]    See <u>In re Peluso</u>, 72 B.R. 732, 738 (Bankr. N.D.N.Y. 1987) (Cited in Green, 934 F.2d at 573.)

favored creditors[15].

Green, 934 F.2d at 573. These last three factors constitute manifestations of bad faith and are discussed under the topic below.

As with any totality-of-the-circumstances test, the analysis does not consist of an accounting, rather, each factor is considered in light of its weight and relevance. A factor that is irrelevant in one case may be determinative in another.

*(1) Financial Trauma.* The first factor concerns whether the debtor has experienced a financial trauma in the time leading up to the filing of the petition. One question that this factor raises is whether the absence of a trauma is reason to deny relief under chapter 7. If a debtor has not experienced a large medical debt, an involuntary change in employment, a change in family conditions, such as a divorce or death of a spouse, should that debtor still be afforded relief under chapter 7? Or should this factor be one that can only weigh in favor of the debtor? It would appear that the answer to both questions is yes. In Attanasio, the Court reasoned.

> Several courts have stated that a factor to be considered in determining substantial abuse is whether the debtor's bankruptcy petition was filed because of sudden illness, calamity, disability, or unemployment. [Citing Green]. The reasoning appears to be that a debtor whose petition was filed because of an intention to incur debts without the ability to pay, should not be entitled to a Chapter 7 discharge, but, that a debtor whose bankruptcy petition was filed because of sudden illness, calamity, disability, unemployment, or other unforeseen forces over which there was no control, should be entitled to a Chapter 7 discharge.
> This Court respectfully disagrees. Clearly, bankruptcy is not limited to those debtors whose difficulties resulted from calamity and had Congress intended for calamity to be a threshold eligibility requirement for Chapter 7 relief it could have included that factor. Section 707(b) was intended and designed to address economic issues, therefore, it should be interpreted in a manner that focuses on a debtor's need for bankruptcy relief, rather than in a manner that attaches other significance to the reasons for the debtor's need

---

[15]    See In re Shands, 63 B.R. 121, 123 (Bankr. E.D.Mich 1985) (Cited in Green, 934 F.2d at 573.)

for bankruptcy relief.

Of course, if the debtor is disabled or unemployed, and for either of those reasons has no income or insufficient income, or the debtor is likely to incur substantial medical bills in the future that will devour disposable income, or the burden to the debtor of paying debts will adversely impact physical or mental health, substantial abuse is not indicated. [Citations omitted]. There are courts that agree and disagree. [Citations omitted].

Attanasio, 218 B.R. at 230-231.

In June of 2003, approximately 10 months before the debtors filed their petition, Mrs. Fulcher lost her job with Merchants Tire, when that company closed its main office. She had been employed by Merchant's Tire for 16 years. She was unemployed for four months. During that time she received $5,088.00, ($1,272.00 per month) in unemployment compensation. After four month, she found employment with Lantern Lane. She now earns about $25,896.00 per year from Lantern Lane. This represents a reduction in annual income of approximately $9,549.00 from 2002, her last full year at Merchant's Tire. The debtors have experienced a financial trauma in the time leading up to the filing of their petition. To the extent that this factor is relevant, it weighs in favor of the debtors.

*(2) Excessive Credit.* The second factor requires the court to ascertain whether the debtor incurred cash advances and made consumer purchases far in excess of his or her ability to pay. This factor cannot mean that a debtor cannot pay his or her debts as they come due. Otherwise, it would present a severe catch-22 by requiring a debtor to be able to pay his or her debts in the normal course in order to be eligible for the protection of chapter 7. Consequently, this factor must require a level of spending that extends beyond any reasonable hope of repayment.

The United States trustee argues that the debtors obtained excessive credit by engaging in free-wheeling spending. At the time that the debt was incurred, they could afford to make the

16

payments on the debt.  They gave a security interest in the items purchased, this diminishing the

possibility that the creditors who made the loans would be left without recourse in the event that

the debtors filed a petition in bankruptcy.

The purchases were for the maintenance and preservation of pet horses.  While they

would not be allowed to continue spending the same amount on pets in a chapter 13 case, the

purchases are not at all similar to the purchases made by the debtors in <u>Grant</u>, which this court

deems to be the standard endorsed by the Fourth Circuit Court of Appeals in <u>Green</u>.

There is no evidence that the debtors incurred excessive credit in a manner that would

constitute substantial abuse of the privileges offered by the bankruptcy process.

*(3) Excessive Budget.*  The third factor concerns whether the debtors' proposed budget is

excessive or unreasonable.  It is first necessary to place this factor in context with the other

factors in light of the purpose of the inquiry.  As one court has stated:

> Any determination of "substantial abuse" necessitates some evaluation of the debtors'
> expense and income statements, and thus some scrutiny of their personal spending habits,
> In re Gyurci, 95 B.R. 639, 643 n.3 (Bankr. D. Minn. 1989), but this Court's role is not to
> formulate the debtors' budget.   Instead, it is to act if there is clear evidence of abuse.
> The last line of § 707(b) grants a presumption in favor of granting relief to the debtor, and
> this presumption should apply when examining the debtors' schedules.   A stricter
> interpretation would lead to non-uniformity and confusion as judges pass personal
> judgement about how people should spend their money.

<u>In re Tefertiller</u>, 104 B.R. 513, 514-515 (Bankr. N.D.Ga. 1989).

The United States trustee argues that the debtor's budget is excessive.   In support of this

argument, the United States trustee states that the debtors understate their gross income by

$965.00 per month and their net monthly take home pay by $766.00.  But neither the debtors'

actual income nor the debtor's stated income is relevant to whether the debtors budget is

17

excessive. A debtor's budget concerns the discretionary expenses as scheduled on the debtors'

Schedule J. It does not include the debtor's income.

Nor are the amounts of monthly payments made on debts secured by collateral, such as

the debtors' vehicles and horse trailer, to be considered under the heading of this factor. Such

amounts are fixed by contract. A debtor has no option but to schedule those amounts at what

they are. Indeed, if the debtors in this case had filed a Schedule J that omitted or misstated the

amounts that they pay toward the debts secured by the vehicles and trailer, there would have been

cause for concern. While a chapter 13 trustee might argue that a debtor's chapter 13 plan is not

confirmable because the debtor's budget includes expenses for debt that is secured by property

that is not necessary for the support of the debtor, that inquiry is not appropriate for purposes of

determining whether a debtor's expenses have been inflated as part of an inquiry under section

707(b). It is only relevant under section 707(b) for purposes of determining whether the debtor

has disposable income that could be used to fund a chapter 13 plan.

The United States trustee has not argued that any of the debtors' discretionary expenses

are excessive. The debtors budget in this case is not excessive.

*(4) Accuracy of the Debtors' Schedules and Statement of Financial Affairs.* The fourth

factor for consideration is whether the debtors' schedule and statement of current income and

expenses reasonably and accurately reflect their true financial condition. In this case, the

debtors' schedules are an accurate reflection of their financial situation. The United States

trustee argues that the debtors understated their net income by about $765.00. As noted, $400.00

of this amount results from the failure of the United States trustee to include income that Mrs.

18

Fulcher actually included in her original Schedule I.[16]

The other $365.00 is based on the trustee's argument that the debtors failed to include Mr. Fulcher's overtime on their schedules. As the debtors explained, the amount of gross and net income scheduled by the debtor in their Schedule I was a reflection of the expectation that Mr. Fulcher would not work much overtime in the future. The schedules were filed on April 12, 2004. As of March 27, 2004, Mr. Fulcher had earned $15,578.17 [Movant's Exhibit #7], or less than $5,200.00 per month. Sixteen days later, on April 12, 2004, he filed his Schedule A which disclosed gross monthly income of $5,633.00, more than $400.00 per month more than his actual monthly income for the preceding months. Additionally, he and his wife disclosed their actual annual income for 2002 and 2003 on their Statement of Financial Affairs. The debtors did not fail to accurately portray their financial condition, either negligently or intentionally. As noted above, this court does not believe that the debtors were required to project overtime income in their Schedules I.

Because the United States trustee's arguments regarding Mr. Fulcher's overtime and Mrs. Fulcher's additional income of $400.00 fail, it must be concluded that the debtors' schedules are accurate.

*(5) Bad Faith.* We now turn to the issue of the whether the debtors filed their petition in good faith or bad faith, the factor that this court believes is at the heart of any consideration of whether granting relief to the debtors would constitute substantial abuse. The three bankruptcy opinions cited by the Fourth Circuit Court of Appeals at the end of its discussion in Green

---

[16]    See note 10, supra and accompanying text.

19

provide a structure for the discussion of bad faith.[17]

The first consideration is whether the debtors engaged in "free-wheeling spending" pre-petition.   We turn to In re Grant, the opinion cited by the Fourth Circuit Court of Appeals in Green, for an understanding of the meaning of the term.   In Grant, the debtors had engaged in a number of pre-petition acts that constitute free-wheeling spending in the eyes of that Court.   In or before 1985, they bought a $700.00 mens' suit from Saks Fifth Avenue and $2,100.00 in women's clothing from an exclusive dress shop.   Additionally, they incurred a $9,000.00 debt the proceeds of which they used primarily to purchase Christmas presents.   They also sent $400.00 per month to their son who was in college in another state.   Today, this would be tantamount to spending $1,500.00 or more on a suit and $20,000.00 for Christmas presents.

All of the debts incurred by the debtors in Grant have two things in common.   First, they are unsecured debts.   The items purchased did not serve as collateral for the purchases.   Second, the items purchased were of an evanescent character.   They were subject to very rapid depreciation.   As such, they could not have served as collateral.   Free-wheeling spending then is the purchase of goods or services that cannot serve as collateral because they tend to depreciate rapidly after purchase.

In the case at bar, the United States trustee argues that the debtors engaged in free-wheeling spending when they incurred $80,000.00[18] in debt pre-petition.   The purchases listed

---

[17]        See notes 13-15, supra and accompanying text.

[18]        The debtors incurred additional debt of $29,204.67 when they purchased the Silverado.   The purchase was made to replace a vehicle that would have required a costly repair of the transmission.   That vehicle secured debt in the amount of $19,291.00 at the time of the trade-in.   The debtor's owed $14,622.37 on the horse trailer on the date of petition.   They had paid $350.00 per month toward that purchase for since October of 2002, a period of approximately18 months.   They incurred approximately $20,000.00 in debt to purchase the horse trailer.   The utility trailer is worth about $2,000.00.   The debtors traded in two motorcycles when the purchased the Harley-

by the United States trustee are a Chevrolet Silverado truck, a truck trailer, a horse trailer and a

Harley Davidson Motorcycle.  In general, these items do not mirror those purchased by the

debtors in <u>Grant</u>.  None of the debt incurred in purchasing these items was unsecured debt.   The

items were of a nature such that they could serve, and did in fact serve, as collateral.  It does not

appear that the Fourth Circuit Court of Appeals had items such as those purchased by the

Fulchers in mind when it cited <u>Grant</u>.

      In a variation on his argument, the United States trustee argues that it is evidence of bad

faith that the debtors created over $80,000.00 in new debt in 2003 when they could have

surrendered the collateral and funded a chapter 13 plan.  This argument is simply a restatement of

the argument that the debtors could have paid some of their unsecured debt if they had filed a

chapter 13 petition.  As such, it serves to emphasize that the existence of disposable income in

this case is the only factor discussed by the Fourth Circuit Court of Appeals in <u>Green</u>.

      The second opinion, cited by the Court in <u>Green</u>, <u>In re Shands</u>, suggests that it could

constitute bad faith if a debtor amends his schedules and statement of financial affairs three or

more times.  The debtors have not amended their schedules at all in this case.

      The third opinion cited by the court in <u>Green</u>, <u>In re Peluso</u>, suggests that it would

constitute bad faith if a debtor were to file a chapter 7 petition and then pay selected creditors

during the pendency of the case or after it is closed.  The United States trustee makes no such

allegations in this case.

      There is no evidence that the debtors have engaged in an act constituting bad faith, either

---

Davidson. They may have incurred an additional $10,000.00 in debt.  So it appears that the total new debt incurred
was about $55,000.00 to $60,000.00 for a truck, a horse trailer, and a motorcycle, before Mrs. Fulcher lost her job.

pre-petition or post-petition. They purchased vehicles and a trailer at a time when they had the
income to pay for those items. Thereafter, Mrs. Fulcher lost a job that she had held for 16 years.
The debtors did not foresee that their income would be significantly reduced in the future. The
fact that they could now pay some of their unsecured debt in a chapter 13 does not change these
facts.

### III. Conclusion

The debtors would have disposable income if they chose to file a chapter 13 petition.
They could have paid something to their unsecured creditors through a chapter 13 plan if they
had disposed of the horse trailer and traded the Chevrolet Silverado in on a less expensive
vehicle. Most of the United States trustee's arguments are re-characterizations of this fact. The
other arguments are based on assertions with which the court does not agree.

The United States trustee argues that the debtors engaged in free-wheeling spending. In
fact, they incurred secured debt when they made the purchases in question. Furthermore, at the
time that the debt was incurred, they could afford to make the payments on the debt. The
purchases were for the maintenance and preservation of pet horses. While they would not be
allowed to continue spending the same amount of pets in a chapter 13 case, the purchases are not
at all similar to the purchases made by the debtors in Grant, which this court deems to be the
standard endorsed by the Fourth Circuit Court of Appeals in Green.

The United States trustee argues that the debtors' family budget is excessive. But, none
of the debtors' discretionary expenses were excessive, as highlighted by the failure of the United
States trustee to object to them. The only expenses that the United States trustee did object to
were contract debts for the Chevrolet Silverado and the horse trailer. The debtors were required

22

to schedule these items at the contract amounts.  Indeed, failure to schedule them as they did

would constitute bad faith.

The United States trustee also argues that the debtors' schedules are not accurate.  The

debtors correctly scheduled their projected income.  And as noted they correctly scheduled their

expenses.  The United States trustee does not argue that the debtors failed to disclose accurate

information in any other part of their schedules or their statements of financial affairs.

Finally, the debtors have not exhibited bad faith.  It was not bad faith for the debtors to

purchase the Chevrolet Silverado, horse trailer and motorcycle at a time when they cold afford to

pay for them.  The purchases may have proven to be imprudent in light of subsequent events,

primarily Mrs. Fulcher's loss of employment, but they were not evidence of bad faith.  Again,

evidence of disposable income in a hypothetical chapter 13 case cannot, without more, be

transformed into evidence of bad faith.

As the Fourth Circuit Court of Appeals stated in <u>Green</u>,

> A debtor who has filed a Chapter 7 petition has elected to discharge his debts by
> liquidating his non-exempt assets.   If the debtor, acting in good faith, preferred to effect
> the discharge by making extended payment to his creditors over time, presumably he
> would have filed under Chapter 13.   The court may advise the latter, but the election
> remains with the debtor, a point underscored by Congress's explicit refusal to adopt a
> mandatory Chapter 13 provision.

<u>Green</u>, 934 F.2d at 573.

The debtors have acted in good faith.  The option to file a chapter 7 petition is theirs.

Under the totality-of-the-circumstances test promulgated in <u>Green</u>, the debtors have not engaged

in substantial abuse. The motion to dismiss will be denied.

The court will issue an appropriate order.

Upon entry of this Memorandum the Clerk shall forward copies to the United States

23

trustee, the chapter 7 trustee, the debtors and Angela M. Barlow, Esq., counsel for the debtors.

Entered on this **9th** day of March , 2005.


William E. Anderson
United States Bankruptcy Judge